16-2020-CA-001430-XXXX-MA Div: CV-F

Filing # 104533359 E-Filed 03/09/2020 10:27:24 AM

IN THE CIRCUIT COURT, FOURTH
JUDICIAL CIRCUIT, IN AND FOR
DUVAL COUNTY, FLORIDA

CASE NO.:
DIVISION:

**ROBEN D. DENNIE,**

     Plaintiff,

v.

**ALLERGAN SALES, LLC,**
**a foreign limited liability company, and**
**RICARDO E. MOJICA,**

     Defendants.

_____/

## <u>COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF</u>

The Plaintiff, **ROBEN D. DENNIE**, sues the Defendants, **ALLERGAN SALES, LLC**,

a foreign limited liability company, and **RICARDO E. MOJICA**, and alleges the following:

### GENERAL ALLEGATIONS

1.     This is an action for damages in excess of $30,000, exclusive of attorney's fees,
costs, and interest.

2.     All conditions precedent to the filing of this action have been performed or have
occurred.

3.     At all times material hereto, the Plaintiff, **ROBEN D. DENNIE** (hereinafter "Ms.
Dennie"), was and is a resident of, and permanently domiciled in, Jacksonville, Duval County,
Florida.

4.     All medical care and treatment rendered to Ms. Dennie upon upon which the
claims set forth herein are based took place in Jacksonville, Duval County, Florida.

5.     The Defendant, **ALLERGAN SALES, LLC** (hereinafter "Allergan"), is a foreign

limited liability company, with its principal place of business and permanent domicile at 2525 Dupont Drive, Irvine, California 92612.

6.    Allergan is authorized to do business in the State of Florida, and has and is doing business in the State of Florida, to-wit:   researching, testing, designing, developing, manufacturing, marketing, promoting, distributing, selling, or otherwise placing into the stream of commerce medical devices and/or pharmaceuticals, including but not limited to, Allergan Natrelle saline filled breast implants and warranties for same, in Jacksonville, Duval County, Florida.

7.    Allergan may be reached for service of process in Florida through its registered agent, CT Corp. System, at 1200 South Pine Island Road, Plantation, Florida 33324.

8.    At all times material hereto, the Defendant, **RICARDO E. MOJICA** (hereinafter "Mojica") was and is a resident of, and permanently domiciled in, the State of Florida, to-wit, at 2425 Northwest 26th Street, Boca Raton, Palm Beach County, Florida.

9.    Allergan and Mojica's co-conspirators, whom Allergan and Mojica aided and abetted, were:  (i). Loren Z. Clayman, M.D. (hereinafter "Clayman Senior"); (ii).  his son, Mark A. Clayman, M.D. (hereinafter "Clayman Junior"); (iii). and their medical professional association, Loren Z. Clayman, M.D., P.A. (hereinafter the "Clayman Practice"). Hereinafter, Allergan and Mojica's co-conspirators will be collectively referred to as the "Claymans."

## FACTUAL ALLEGATIONS

10.    For at least 15 years, Allergan has known that Clayman Senior, Clayman Junior, and the Clayman Practice were lying to hundreds of female patients by telling them they had ruptured, deflated, or leaking saline breast implants so the Clayman Practice could collect free implants and surgical fees for replacement surgeries.  Allergan knew the Claymans were lying because:  (1). Allergan's own Southeast Regional Sales Director, Mojica, through the sales

2

representatives working under him, first proposed to, and repeatedly encouraged, his Florida plastic and cosmetic surgery customers (including the Claymans) to lie to their patients and on breast implant warranty claim forms about the condition of saline implants in order to obtain free breast implants and surgical fees; (2) As Allergan received a breast implant warranty claim form signed by the patient and Clayman Senior or Junior for each warranty claim made by the Clayman Practice, Allergan was aware that the Clayman Practice was lying to its patients about the condition of their breast implants; (3). for each warranty claim made by the Clayman Practice, Allergan examined the implants at issue and found that they were not defective; and (4). the Clayman Practice's saline breast implant failure rate was markedly higher than the failure rate of 1.5% for each year after surgery that Allergan's own studies of its saline breast implants showed.

Despite this knowledge, Allergan paid every saline breast implant warranty claim made by the Clayman Practice—5,278 claims—between January 1, 2006 and December 31, 2015. Allergan paid these claims because the Clayman Practice purchased large quantities of breast implants, other medical devices, and pharmaceuticals from Allergan, and Allergan wanted to encourage and promote the Clayman Practice's continued purchase of their products. As demonstrated by the multiple criminal and civil proceedings against Allergan within the past 10 years, it is apparently an integral part of Allergan's marketing plan to pay (bribe) physicians to use its products. For these reasons, Allergan is liable to Ms. Dennie for aiding and abetting and conspiring with Clayman Senior, Clayman Junior, and/or the Clayman Practice.

### Allergan and McGhan/Inamed

11.    Donald K. McGhan worked at the laboratory where Dow Corning first made breast implants. In 1974 he founded McGhan Medical Corp., which began marketing silicone filled breast implants in 1975.

12.    In 1986 McGhan Medical Corp. merged with First America Corporation, changing its name to Inamed. The new company's breast implants were still labeled McGhan breast implants. By this time, the company was one of the largest breast implant manufacturers in the world.

13.    In March 2006, Inamed merged with Allergan, a multinational manufacturer of healthcare products in many different categories, including the following: dermatology, central nervous system, eye care, women's health and urology, gastroenterology, cardiovascular diseases, infectious diseases, and aesthetics. Among Allergan's products are Botox (therapeutic and aesthetic), Namenda, Restasis, Linzess, Bystolic, Juvederm, Latisse, Loestrin, Estrace Cream, Teflaro, Dalvance, Ozurdex, Optive, Viibryd, Liletta, and Saphris. After the merger with Inamed, McGhan Natrelle Saline Filled Breast Implants became known as "Allergan Natrelle Saline Filled Breast Implants."

<strong>Allergan's Breast Implant Warranty Scheme</strong>

14.    After the merger, Allergan created Allergan Partnership Privileges (hereinafter "APP").[1] APP provided members with rebates, sales growth rewards, a special online physician locator listing, priority customer service line access, preferred shipment status, and certificates and status displays; the purposes of APP was to leverage sales across its entire line of aesthetic products. To become an APP Partner, a medical practice had to purchase at least three types of aesthetic products: Botox (one of the company's most profitable products), a dermal filler (i.e., Juvederm), and breast implants. APP had several tiers based upon the volume of Allergan aesthetic product purchases: Bronze, Silver, Gold, Platinum, and Diamond; Diamond tier partners received the highest level of perks from Allergan.[2]

---

[1]    As of January 31, 2020, Allergan discontinued the APP.
[2]    Allergan later added another tier to the top level, Double Diamond.

15.    Despite implementing the APP, in most regions Allergan's breast implants sales lagged behind those of its chief competitor, Mentor, which offered breast implants at lower prices.

16.    To increase the volume of breast implants sales, Allergan encouraged and approved regional sales directors in certain regions[3] to direct their sales representatives to expressly offer Diamond tier APP partners incentives that, crossing legal and ethical boundaries, *amounted to kickbacks and bribes*.  In some instances, they offered Diamond APP partners free travel and lavish non-educational parties in exchange for greater breast implant purchases.  In other instances, in exchange for increased breast implant purchases, representatives provided Diamond tier surgeons free implants and surgical fees by allowing them to make false breast implant warranty claims.

17.    In the false warranty scheme, in exchange for higher breast implant purchases, Allergan's sales and marketing representatives (including Mojica and those working for him) expressly directed Diamond tier surgery practices (including the Claymans) to falsely claim implants had spontaneously ruptured, deflated, or leaked so they could receive free breast implants and surgical fees under the warranty.  One effect of this scheme was that it facilitated "cover ups" by certain surgeons who falsely attributed poor breast surgery outcomes to ruptured, deflated, or leaking implants rather than careless surgical practices.    As such, these surgeons were able to make more money from poor surgical practices, as Allergan increased its percentage of the breast implant market despite Mentor's lower prices.

---

[3]    Among the known regions where the warranty scheme was encouraged were Southern California, Colorado, and Florida.

### The Clayman Practice

18.     Clayman Senior was first licensed as a medical doctor in Florida on January 10, 1975.  On December 31, 1976, he completed a residency in plastic surgery, and he began practicing in Jacksonville, Florida.  Soon after establishing the Clayman Practice, he began performing breast augmentation surgeries.  During the 1980's, a substantial portion of the breast augmentation procedures he performed were with silicone filled breast implants.

19.     After the FDA prohibited the widespread use of silicone breast implants in 1992, Clayman Senior began using saline filled implants exclusively.

20.     As of the early 2000s, the Clayman Practice began marketing its breast augmentation practice to patients of modest means.  To reach this population, the Clayman Practice advertised extensively in free local discount publications.  Furthermore, the Clayman Practice began charging less for breast augmentations than other local plastic surgeon; while most plastic surgeons charged between $5,000 and $10,000, the Clayman Practice charged only $3,750.  As a result, the Clayman practice became a high-volume breast augmentation plastic surgery practice.

### Ricardo E. Mojica

21.     Between 2000 and 2006, Mojica worked as a surgical sales representative for Inamed/McGhan.  The products he sold were breast implants, facial implants, and injectable "fillers."

22.     In 2002, Mojica was promoted to the Southeast Team Field Trainer.

23.     In 2003, Mojica was named "sales representative of the year" by Inamed/McGhan for achieving $1,040,000 in sales, which was an increase of 37% from the previous year.

24.     After the merger with Allergan, Mojica was promoted to Southeast Regional Sales Director, for which his territories included Florida, Georgia, and South Carolina.  Mojica

held this position between 2006 and 2013. According to his personal LinkedIn profile, he was "responsible for leading and developing an elite 10-member sales team," of which he claimed the "foundation of our success was achieved through a collaborative and synergistic team culture." He also attributes his success as the Southeast Regional Sales Director to "helping team members achieve their individual goals and open collaboration channels to share effective practices."

25.     In reality, Mojica trained and directed his sales representatives to act in ways that previous managers had prohibited. Specifically, he trained and directed them to expressly offer Diamond tier APP partners non-educational parties and travel in exchange for increased implant purchases. He also trained and directed them to employ the breast implant warranty scheme (see paragraphs 14-17). Specifically, sales representatives were trained and directed to expressly offer Diamond tier partners free breast implants and surgical fees for false warranty claims in exchange for higher breast implant purchases.

26.     Soon after adopting these unethical and illegal sales practices, Allergan's breast implant sales volumes increased rapidly in Mojica's region, particularly in Florida, even though Mentor continued to offer lower prices on implants. As the volume of breast implant sales increased, the profit per pair of implants diminished, and the number of returned implants increased.

27.     In 2013, Mojica was promoted to Senior Director, Medical Education. In his new position with Allergan, Mojica was responsible for "building and leading a high-performing team responsible for development of the plastic surgery sales force and plastic surgeons." In this capacity, Mojica began training and directing sales representatives across the country to, among other things, employ the breast implant warranty scheme with Diamond tier partners.

### The Allergan/Mojica-Clayman Conspiracy

28.    Until the mid-2000s, the Clayman Practice purchased saline breast implants from Allergan's predecessor (Inamed/McGhan) *and Mentor*. During this time, Clayman Senior began "covering up" his poor surgical practices by blaming post-augmentation complications on leaking, ruptured, or deflated implants. Clayman Senior lied to his patients because he knew that by claiming that the implants were defective, he could divert blame for the complications away from himself.

29.    During a single year in the mid-2000s, the Clayman Practice made more than 40 warranty claims to Mentor. In response, Mentor's quality assurance department contacted the regional sales manager and advised him that the high number of claims was indicative of fraud. Mentor asked the regional sales manager to meet with Clayman Senior and demand an explanation for the unusually high number of warranty claims. Clayman Senior refused to meet with the sales manager. As a result, Mentor permanently ended its relationship with the Clayman Practice, and Inamed/McGhan became the Clayman Practice's sole breast implant supplier.

30.    After Allergan acquired Inamed/McGhan in 2006, the company adopted the APP and installed Mojica as the Sales Director for the Southeast Region, which included Jacksonville, Florida. Soon afterward, the Clayman Practice became a Diamond tier partner in the APP as a result of its high-volume purchases of Allergan aesthetic products such as Botox, Juvaderm, and Natrelle saline breast implants.

31.    Mojica directed his sales representatives to expressly offer the Clayman Practice an opportunity to participate in the breast implant warranty scheme. With that, the Claymans had found in Allergan, through Mojica and his sales representatives, a partner willing to assist them in defrauding their patients. Thereafter, Allergan and the Claymans developed a symbiotic

relationship built upon the mutual knowledge and understanding that the Claymans were lying to their patients about the condition of their breast implants to receive free breast implants and surgical fees in exchange for purchasing high volumes of aesthetic products from Allergan.

32.    Between 2006 and 2015 the Clayman Practice made the following warranty claims, for which Allergan made the following payments:

| Year | Warranty Claims | Warranty Payments to the Clayman Practice |
|------|-----------------|-------------------------------------------|
| 2006 | 84 | $  106,800 |
| 2007 | 76 | $  110,400 |
| 2008 | 150 | $  213,600 |
| 2009 | 261 | $  261,000 |
| 2010 | 521 | $  855,600 |
| 2011 | 866 | $1,420,000 |
| 2012 | 849 | $1,380,000 |
| 2013 | 798 | $1,330,000 |
| 2014 | 1,057 | $1,770,000 |
| 2015 | 616 | $1,090,000[4] |

33.    To make a breast implant warranty claim, surgery practices were required to return "defective implants" to Allergan, where members of the product surveillance department performed what they called *Laboratory Analyses*, a series of tests designed to identify root

---

[4]    The undersigned does not have records reflecting the number of breast implant warranty claims the Clayman Practice made to Allergan after 2015.

causes of ruptures, deflations and leaks. The product surveillance department would then generate *Laboratory Analysis* reports detailing their findings. [5]

34.     Nearly every *Laboratory Analysis* report for saline breast implants returned by the Clayman Practice found no evidence of a "loss of shell integrity, resulting in implant rupture or deflation," which was a requirement for payment under Allergan's warranty. <u>Nevertheless, Allergan paid every warranty claim from the Clayman Practice between 2006 and 2015;</u> this amounted to **5,278 warranty claims for a total of $8,537,400 in payments**.

35.     Allergan's own studies of its saline breast implants showed a failure rate that was markedly lower than the failure rate experienced by the Clayman Practice. According to this study, the failure rate for Allergan Natrelle saline breast implants was only 1.5% for each year after surgery.

36.     Allergan has had a deep financial motivation for paying the Clayman Practice's 5,278 warranty claims. Between January 1, 2008 and December 31, 2015, the Clayman Practice purchased 11,082 pairs of saline breast implants from Allergan, which made the Clayman Practice one of Allergan's top 10 breast implant customers in Florida. Furthermore, the Clayman Practice purchased a host of other aesthetic products from Allergan, including the following: Botox, Latisse, Juvederm, Kybella, SkinMedica, Vivate, and CoolSculpting (a product marketed by Zeltiq Aesthetics, which is a subsidiary of Allergan). Since Allergan adopted the APP, the Clayman Practice has essentially become a "one supplier shop." When a nurse employed by the Clayman Practice asked Clayman Senior why he believed Allergan would keep paying his breast

---

[5]     One important reason the Allergan-Clayman conspiracy went undiscovered for so many years was that Allergan did not as a matter of course provide patients with copies of their *Laboratory Analysis* reports.

implant warranty claims, he told her, "I know they're going to pay them all because I'm a Diamond level partner."

37.    During this same time period, other plastic surgery practices that were not APP Diamond tier partners had their saline breast implant warranty claims denied by Allergan, even though they made fewer than 5 warranty claims per year.

38.    Furthermore, to the best of the undersigned's information and belief, Allergan has devised an "off-balance-sheet" method of paying breast implant warranty claims.  Specifically, Allergan pays breast implant warranty claims through a captive insurance company created and owned by Allergan.[6]  When a manufacturer such as Allergan creates a captive insurance company, the manufacturer is provided a means of reclassifying otherwise taxable income from across its various divisions and subsidiaries as "premium payments" that go to the captive insurance company.   The formerly taxable income that is reclassified as "premiums" then accumulates within the captive, making it, essentially, a large "slush fund."  In the event the manufacturer uses the captive insurance company to pay a "loss," such as a breast implant warranty payment, the loss is not reflected in the manufacturer's balance sheets or filings with the Securities and Exchange Commission.  In addition, because the captive is not a third-party company, manufacturers with captive insurance companies are free to manipulate the claims process without outside interference.

### Allergan's Similar Course of Conduct Across Other Divisions

39.    The breast implant warranty scheme is not the first instance in which Allergan has been implicated in a physician bribery scheme, as Allergan has been implicated in violations of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), at least six times, resulting in Allergan

---

[6]      See, https://opencorporates.com/companies/us_hi/206243D1.

paying a total of $1.089 billion in criminal penalties and civil settlements.

40.    The federal Anti-Kickback Statute prohibits anyone from

knowingly and willfully offer[ing] or pay[ing] remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

...

(B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program[7]...

42 U.S.C. §1320a-7b(b)(2).

41.    Over the past ten years, Allergan was involved in the following:

A.    **September 1, 2010,** Allergan was forced to pay $600 million in settlement of criminal and civil complaints that included allegations of providing free physician workshops and dinners, paying physicians to attend "advisory boards" promoting off-label uses, and created Alphamedica, which administered a speakers bureau that paid physicians $1,000 to allow sales representatives to shadow them at work.[8]

B.    **September 15, 2010,** Allergan's Forest Laboratories division was forced to pay a $313 million settlement of criminal and civil complaints that included allegations of cash payments to physicians that the company described as "grants" and "consulting

---

[7]    Because the Clayman Practice's patients paid for their breast augmentation procedures with cash (not under a Federal health care program), the Anti-Kickback Statute does not apply to the Clayman scheme, and Plaintiffs assert no claim under the Anti-Kickback Statute. Plaintiffs, however, allege the facts concerning Allergan's conduct in violation of the Anti-Kickback Statute to show this Court that it is plausible that Allergan, consistent with its past criminal conduct, engaged here in criminal conduct by conspiring with, and substantially assisting, the Clayman Practice to perpetrate fraud upon its patients.

[8]    *See,*    https://www.justice.gov/opa/pr/allergan-agrees-plead-guilty-and-pay-600-million-resolve-allegations-label-promotion-botox;    https://www.cbsnews.com/news/how-allergan-sponsored-a-history-of-sausages-to-promote-botox-illegally/.

fees," expensive meals, and lavish entertainment to physicians to induce them to prescribe the drugs Celexa and Lexapro.[9]

   C. **October 29, 2015,** Allergan's Warner Chilcott division was forced to pay a $125 million settlement in a case that included allegations of violations of paying doctors speaking fees to induce them to prescribe the drugs Asacol, Actonel, and Loestrin.[10]

   D. **December 15, 2016,** Allergan's Forest Laboratories division was forced to pay a $38 million settlement in a case that included allegations of paying kickbacks to physicians to induce them to prescribe the drugs Bystolic, Savella, and Namenda.[11]

   E. **June 29, 2017,** Allergan was forced to pay a $13 million settlement in a case involving allegations of providing valuable business consulting services, continuing medical education, and other valuable services to physicians to induce them to prescribe Allergan eye care products including Restasis, when other less expensive treatment alternatives were available.[12]

42. Allergan's previous conduct demonstrates that its involvement in the breast implant warranty scheme was and is part of a larger course of conduct whereby the company's marketing plan includes bribing physicians to increase sales.

---

[9] *See,* https://www.justice.gov/opa/pr/drug-maker-forest-pleads-guilty-pay-more-313-million-resolve-criminal-charges-and-false.

[10] *See,* https://www.wsj.com/articles/allergan-unit-to-plead-guilty-to-fraud-pay-125-million-1446139657/?mod=mktw.

[11] *See,* https://www.justice.gov/opa/pr/forest-laboratories-and-forest-pharmaceuticals-pay-38-million-resolve-kickback-allegations.

[12] *See,* http://www.pietragallo.com/library/files/nevyas_allergan_press_release_final.pdf.

**Roben D. Dennie**

43.     Ms. Dennie first presented for a consultation with Clayman Senior on May 5, 2011. On that date she reported dissatisfaction with the results of a prior breast augmentation by another plastic surgeon, and she wanted to be evaluated for an abdominoplasty. After examining her, Clayman Senior told her that she had a possible deflation at her left breast implant, and that she needed to have surgery to remove and replace both implants. Clayman Senior told her that he would charge her $3,000 for the "re-augmentation," but that Allergan would supply new implants at no charge to her. On that date, Clayman Senior and/or Clayman Practice staff provided her with a written surgical estimate that stated she had a "possible left deflation" for which she needed a "Re-Augmentation."

44.     On July 19, 2011, Ms. Dennie returned to the Clayman Practice for the recommended surgery. After she paid for the surgery, Clayman Senior and/or Clayman Practice staff had her sign an "Authorization for and Consent to Surgery or Therapeutic Procedures that stated she had a "Possible left deflation." A preoperative photograph taken of her breasts demonstrated that she did not have a rupture, deflation, or leak at either of her breast implants.

45.     In the Operative Report dated July 19, 2011, Clayman Senior documented a preoperative diagnosis of "Post breast augmentation with ptosis & asymmetry from another surgeon." Furthermore, in the body of the Operative Report, Clayman Senior did not document a rupture, deflation, or leak at either breast implant. Instead, he documented removing the existing implants and replacing them with Allergan Natrelle Style 68 High Profile 425cc saline implants which he inflated to 600cc each.

46.     In the OR Record, Clayman Senior documented a preoperative diagnosis of "left deflation." He further documented "Tissue @ Valve Lt & Rt."

14

47.     On September 9, 2011, Ms. Dennie returned and reported that her right breast was "droopy" and lower than her left breast. After a brief examination, Clayman Senior told her that she had a deflation at her left breast implant, and that she needed surgery to remove and replace it. That same date, Clayman Senior and/or Clayman Practice staff gave Ms. Dennie a written surgical estimate that stated she had a "R Deflation," for which she needed to have a removal and replacement surgery, and that "Co. will supply."

48.     On September 12, 2011, Ms. Dennie returned to the Clayman Practice for the recommended revision surgery. On that date, Clayman Senior and/or Clayman Practice staff had her sign an "Authorization for and Consent to Surgery or Therapeutic Procedures" that stated, "Medial Crescent Bilateral with Overfill, Possible Right Deflation." Right deflation Bilateral Replace." A preoperative photograph taken that day demonstrated that she did not have a rupture, deflation, or leak at either of her breast implants.

49.     According to the Operative Report dated September 12, 2011, Clayman Senior documented her preoperative diagnosis as "Status post augmentation revision from another surgeon, desires more lift and fuller." Clayman Senior further documented that upon dissecting down through the right implant capsule, the implant was removed and "tissue was identified within the valve of the right implant." The left implant was found to be intact, but it was also removed. Both implants were removed and replaced with Allergan Natrelle 465cc High Profile saline implants that he inflated to 640cc each.

50.     According to the OR Record dated September 12, 2011, the preoperative diagnosis was "Right Deflat. Possible." Clayman Senior further documented that at the right implant the was "tissue in valve," but "No Leak."

51. On November 17, 2011, Ms. Dennie returned to the Clayman Practice and reported to Clayman Senior that she had pain in her left breast, and that her right breast was smaller than her left breast, and droopy.

52. On January 19, 2012, Ms. Dennie returned again to the Clayman Practice and reported to Clayman Senior that her right breast was smaller than her left breast. After briefly examining Ms. Dennie, Clayman Senior told her she had a deflation at her right breast implant, and that she needed surgery to remove and replace both implants. That same date, Clayman Senior and/or Clayman Practice staff gave Ms. Dennie a written surgical estimate that stated she had a "Right deflation" for which she needed a "Bilateral Replace," but that "Co. will supply."

53. On February 21, 2012, Ms. Dennie presented for the recommended revision surgery yet again. On that date, Clayman Senior and/or Clayman Practice staff had her sign an "Authorization for and Consent to Surgery or Therapeutic Procedures" that stated she had a "R def" for which she would be having a "bilateral replace." A preoperative photograph taken that same date demonstrated that she did not have a deflation, rupture, or leak at either of her implants.

54. According to the Operative Report dated February 21, 2012, her preoperative diagnosis was "Right implant deflation, desires more lift and higher placement on the chest." According to the OR Report of the same date, her preoperative diagnosis was "Rt deflation Bilateral Replace." Clayman Senior documented in the Operative Report that upon dissecting down to the right breast implant capsule, the implant was removed and "found to have a leak with tissue in the implant valve." The left implant was found to be intact, but it was also removed. Clayman Senior documented that both implants were replaced with Allergan Natrelle Medium Profile 480cc saline breast implants that he inflated with 680cc each.

16

55.    On or between February 21, 2012, and February 24, 2012, Clayman Senior and/or Clayman Practice staff had Ms. Dennie sign an Allergan warranty claim form that stated her she had a rupture, deflation, or leak at her right breast implant which required surgery to remove and replace both of her implants. Pursuant to Allergan's warranty, the Clayman Practice sent the removed implants and completed warranty form to Allergan's Product Support Department, from which it was forwarded to the Device Analysis Laboratory. After conducting an analysis of the implants, the Device Analysis Laboratory found no evidence of the claimed rupture, deflation, or leak at the right implant. Nevertheless, on April 26, 2012, the Clayman Practice received a warranty check for $1,200 from Allergan in relation to the removed implants.

56.    Since her last breast surgery with Clayman Senior, Ms. Dennie's right breast is still lower than her left breast. Both implants are hard, tight, and painful.

**COUNT I – ALLERGAN AND MOJICA AIDING AND ABETTING**

**THE CLAYMANS' BREACH OF FIDUCIARY DUTY AND/OR FRAUD**

57.    Ms. Dennie re-alleges and incorporates by reference paragraphs 1 through 56.

58.    Throughout the care and treatment of Ms. Dennie, the Claymans breached their fiduciary duty to her by:

(a).    Recommending or insisting on Allergan saline implants based on his/their/its direct financial motivation, rather than making appropriate recommendations based on the best interests of the patient.

(b).    Claiming that one or more of her breast implants had ruptured, deflated, or leaked when they had not.

(c).    Performing a revision surgery on February 21, 2012 based upon an alleged implant rupture, deflation, or leak that did not exist, which placed her at an increased risk

for surgical and anesthetic complications, and which involved simply repeating the same procedure that was previously performed.

(d).   Not performing the surgery that her physical condition actually required, in favor of surgery that took less time and skill, to allow for the removal and replacement of Allergan Natrelle saline implants under the Warranty.

59.   On one or more of the below occasions, the Claymans made the following false statements or representations, which were intended to conceal their financial and other personal motivations in connection with the removal and replacement of allegedly ruptured, deflated, or leaking Allergan Natrelle saline implants, and which in fact misled Ms. Dennie and/or others, and/or caused her to respond in the following ways to her detriment:

(a).   On January 19, 2012, at his office Clayman Senior told Ms. Dennie that she had a rupture, deflation, or leak at her right breast implant, and that both of her implants needed to be removed and replaced.   In fact, Ms. Dennie did not have an implant deflation, rupture, or leak, and Clayman Senior did not have the intention or ability to correct the actual problems with her breasts.   These representations caused Ms. Dennie to conclude that the problems she was experiencing with her breasts were the result of a defective breast implant rather than negligence by Clayman Senior; these representations also caused her to agree to have another surgery by Clayman Senior instead of from a different plastic surgeon.   As a result, Ms. Dennie did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

(b).   In a written surgical estimate prepared on January 19, 2012, Clayman Senior and/or Clayman Practice staff represented to Ms. Dennie that she had a "Right deflation," that she needed to have a "Bilateral Replace" surgery, and that the surgery

would be at no charge to her because "Co. will supply." In fact, Ms. Dennie did not have a breast implant deflation, rupture, or leak, and Clayman Senior did not have the intention or ability to correct the problems with her breasts. These representations caused Ms. Dennie to conclude that the problems she was experiencing with her breasts were the result of a defective breast implant and not due to negligence by Clayman Senior; these representations also caused her to agree to have another surgery by Clayman Senior instead of by a different plastic surgeon. As a result, Ms. Dennie did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

(c).    In the "Authorization for and Consent to Surgery or Therapeutic Procedures" dated February 21, 2012, Clayman Senior and/or Clayman Practice staff represented to Ms. Dennie that had a "R[ight breast implant] def[lation]," and that she needed to have a "bilateral replace[ment surgery of both breast implants]." In fact, Ms. Dennie did not have a rupture, deflation, or leak of her implant, and Clayman Senior did not have the intention or ability to correct the problems with her breasts. These representations caused Ms. Dennie to conclude that the problems she was experiencing with her breasts were the result of a defective breast implant and not due to the negligence of Clayman Senior; these representations also caused her to agree to have another surgery by Clayman Senior instead of from a different plastic surgeon. As a result, Ms. Dennie did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

(d).    In the Operative Report and OR Record dated February 21, 2012, Clayman Senior represented to Ms. Dennie and others that she had a "Right implant deflation" that required her to have both of her breast implants removed and replaced. In

fact, Ms. Dennie did not have a rupture, deflation, or leak at either of her breast implants, and Clayman Senior did not have the intention or ability to correct the problems with her breasts. These representations caused Ms. Dennie to conclude that the problems she was experiencing with her breasts were the result of a defective breast implant rather than the medical negligence of Clayman Senior; these representations also caused her to agree to have another surgery by Clayman Senior instead from of a different plastic surgeon. As a result, Ms. Dennie did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

(e).    On or about February 21, 2012, and March 2, 2012, the Claymans made a warranty claim to Allergan regarding the right breast implant removed on that February 21, 2012. Specifically, the Claymans had Ms. Dennie sign a warranty claim form indicating that she had a rupture, deflation, or leak at her right breast implant for which she needed a removal and replacement procedure for both of her implants. By having Ms. Dennie sign this claim form the Claymans represented to her and others that her breast implant was ruptured, deflated, or leaking and needed to be replaced. In fact, Ms. Dennie did not have a rupture, deflation, or leak of her breast implant, and Clayman Senior did not have the intention or ability to correct the problems with her breasts. These representations caused Ms. Dennie and others to conclude that the problems she was experiencing with her breasts were the result of a defective breast implant rather than the medical negligence of Clayman Senior; these representations also caused her to agree to have another surgery by Clayman Senior instead from a different plastic surgeon. As a result, Ms. Dennie did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

60.     For the previously stated reasons in paragraphs 30 through 38 above, Allergan and Mojica knew that the Claymans were breaching a fiduciary duty owed to Ms. Dennie, and/or committing fraud upon her.   Despite this knowledge, Allergan and Mojica provided substantial assistance to the Claymans in committing fraud against Ms. Dennie, and/or breaching a fiduciary duty owed to her, in one or more of the following ways:

(a).     Continuing to sell saline breast implants to the Claymans while Ms. Dennie was a patient of the Claymans; and

(b).     Ensuring payment of the warranty claim of the Claymans in relation to the right saline implant that Clayman Senior placed into Ms. Dennie on September 12, 2011, and which Clayman Senior surgically removed on February 21, 2012.

61.     As a direct and proximate result of the substantial assistance provided by Allergan and Mojica to the Claymans, Ms. Dennie suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

62.     Furthermore, as a direct and proximate result of the above noted substantial assistance provided by Allergan and Mojica to the Claymans, Ms. Dennie has spent monies in the amount of $3,750 or more, for medical and/or surgical care by the Claymans that was of no value, and which has caused her to have to incur future medical expenses in the future to correct the damages done by said medical and/or surgical care.

WHEREFORE, the Plaintiff, **ROBEN D. DENNIE**, demands judgment for compensatory damages against the Defendants, **ALLERGAN SALES, LLC** and **RICARDO E. MOJICA**, together with the costs of this action, and the Plaintiff respectfully demands a trial by

21

jury on all issues so triable.

## COUNT II – ALLERGAN, MOJICA, AND THE CLAYMANS' CONSPIRACY TO
## COMMIT BREACH OF FIDUCIARY DUTY AND/OR FRAUD

63.     Ms. Dennie re-alleges and incorporates by reference paragraphs 1 through 56, 58 and 59.

64.     On or before May 5, 2011, Allergan, Mojica, and the Claymans entered into an agreement to commit one or more breaches of a fiduciary duty and/or fraud in relation to the Claymans' patients.  The acts and conduct illustrative of the parties' intent to enter into this agreement are alleged in paragraphs 30 through 38 above.  Furthermore, Mojica had a personal stake in the activities of the conspiracy that was separate from Allergan's interests in the conspiracy, i.e. his personal advancement within the company and individual incentive pay and/or commissions.

65.     Allergan and Mojica committed one or more of the following overt acts in furtherance of the conspiracy to breach a fiduciary duty and/or to commit fraud:

(a).     Continuing to sell saline breast implants to the Claymans while Ms. Dennie was a patient of the Claymans; and

(b).     Ensuring payment of the warranty claim of the Claymans in relation to the right saline implant that Clayman Senior placed into Ms. Dennie on September 12, 2011, and which Clayman Senior surgically removed on February 21, 2012.

66.     As a direct and proximate result of the above noted conspiracy to commit fraud and/or breach of fiduciary duty, Ms. Dennie suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care

and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

67.    Furthermore, as a direct and proximate result of the above noted conspiracy to breach a fiduciary duty and/or to commit fraud, Ms. Dennie has spent monies in the amount of that was of no value, and which has caused her to have to incur future medical expenses to correct the damages done by said medical and/or surgical care.

WHEREFORE, the Plaintiff, **ROBEN D. DENNIE**, demands judgment for compensatory damages against the Defendants, **ALLERGAN SALES, LLC** and **RICARDO E. MOJICA**, together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

## COUNT III – FLORIDA CIVIL RICO AND REMEDIES
## FOR CRIMINAL ACTIVITIES – CONSPIRACY

68.    Ms. Dennie re-alleges and incorporates by reference paragraphs 1 through 56, 58 and 59.

69.    Allergan and Mojica violated sections 772.103(4) and 895.04(4), *Florida Statutes*, by conspiring with the Claymans to violate sections 772.103(3) and 895.03(3), respectively.

70.    In connection with the fraudulent scheme, Allergan, Mojica, and the Claymans agreed to accomplish an unlawful plan to engage in a pattern of criminal and racketeering activity.

71.    Allergan, Mojica, and the Claymans agreed to the overall objective of the conspiracy, or they agreed to commit personally at least two acts of criminal and racketeering activity.

72.    The predicate acts of Allergan, Mojica, and/or the Claymans began at an unknown date, and involved hundreds of the Claymans' breast implant patients.

73.    The predicate acts of Allergan, Mojica, and/or the Claymans continued to occur against the Claymans' breast implant patients at least until October 26, 2017.

74.    As a direct and proximate result of the predicate acts taken in furtherance of the conspiracy, Ms. Dennie suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

75.    Furthermore, as a direct and proximate result of the predicate acts taken in furtherance of the conspiracy, Ms. Dennie has spent monies in the amount of $3,750 or more, for medical and/or surgical care by Clayman Senior and/or the Clayman Practice that was of no value, and which has caused her to have to incur future medical expenses to correct the damages done by said medical and/or surgical care.

76.    Despite her diligence and efforts, Ms. Dennie's discovery of these ongoing injuries was delayed by Allergan, Mojica, and/or the Claymans' fraudulent concealment activity.

77.    As a result of the foregoing, Ms. Dennie has had to hire the undersigned attorney and his law firm, and has agreed to pay him/them a reasonable fee for their services.

78.    Pursuant to section 772.104, *Florida Statutes*, Ms. Dennie is entitled to recover treble damages plus costs and attorney's fees from Allergan and Mojica.

WHEREFORE, the Plaintiff, **ROBEN D. DENNIE**, pursuant to Section 895.05, *Florida Statutes*, demands judgment for treble actual and consequential damages arising from the conduct of the Defendants, **ALLERGAN SALES, LLC** and **RICARDO E. MOJICA**, an award of costs and all reasonable attorneys' fees, and the following additional remedies:

A.    A preliminary injunction prohibiting similar conduct by the Defendants in the

State of Florida;

B.      A permanent injunction prohibiting similar conduct by the Defendants in the State of Florida;

C.      Revocation of the certificate authorizing the Defendant, **ALLERGAN SALES, LLC**, to do business in the State of Florida;

D.      Forfeiture of all monies and real and personal property received or obtained by the Defendants as a result of the acts alleged in this Count, and the Plaintiff, **ROBEN D. DENNIE**, will have a claim for any and all such forfeited monies and real and personal property;

E.      A civil penalty against the Defendant, **RICARDO E. MOJICA**, in the amount of $100,000;

F.      A civil penalty against the Defendant, **ALLERGAN SALES, LLC**, in the amount of $1,000,000; and

G.      Any further relief the Court deems just and proper.

Dated this 9th day of March, 2020.

/s/ Christopher Shakib
**Christopher Shakib, Esquire**
**TERRELL HOGAN & YEGELWEL, P.A.**
233 East Bay Street, 8th Floor
Jacksonville, Florida 32202
Telephone:    (904) 632-2424
Facsimile:    (904) 632-5049
Primary Email: shakib@terrellhogan.com
Secondary Email: jfleury@terrellhogan.com
Florida Bar No.: 0947865
Attorney for the Plaintiff